Good morning, ladies and gentlemen. Our first case of the morning is 119162, People of the State of Illinois v. James E. Grant. Are you ready to proceed? Appellee, ready? Good morning. May it please the court? So moved. I'm an assistant attorney general, Katherine Dorsch, on behalf of the people. The appellate court held that the state may not retain an expert to examine a respondent and testify at a recovery proceeding, such as the Sexually Dangerous Persons Act. The court also held that if such an expert is permitted under some circumstances, due process required that an independent expert also be appointed for the respondent in such a circumstance. The appellate court was wrong on both counts. This court should reverse the appellate court's judgment and hold that the state may, consistent with the Sexually Dangerous Persons Act, retain an expert to examine a respondent and testify at a recovery proceeding. The court should further hold that due process does not require the appointment of an expert for a respondent simply because the state has retained one. First, I'd like to give the court a little background. In 2002, respondents stipulated to the two doctor's reports where they opined that he was a sexually dangerous person and admitted the contents of the sexually dangerous person's petition. In 2012, he filed the present application for recovery. Under Section 9 of the Act, filing triggers an evaluation. Under Section 9A, when a respondent files an application, then the director of the Department of Corrections is to cause an evaluation to occur. Under the statute, at the time of the respondent's petition or application, that evaluation must be performed by a psychiatrist, a psychologist, and a social worker. So later that year, later in 2012, I'm sorry, let me back up. This is an important detail. Formerly, all three of those state evaluators were employees of the Department of Corrections. So they had some familiarity, they had gained some familiarity with the respondents during their treatment, during the process of the Department of Corrections. But by the time of the respondent's most recent application, the Department of Corrections had contracted out the entire evaluation process to the Wexford Health Company. So these evaluators didn't have that same familiarity with the respondents as they did under the old system. As I was saying earlier, the Wexford evaluators then submitted their report later that year. And it was kind of a mystery to the State's Attorney because it's about 15 pages long of real text. Of his first 14 pages, it explains that the respondent's made no progress whatsoever in treatment. He remains at the introductory phase. He's got no understanding of his offense cycle, what might trigger an offense, or what kind of relapse prevention or intervention that he could use to stop any future offense. In fact, he denied having committed any sex offenses at all. And his most recent semiannual evaluation from his treatment providers reflect that he performed poorly in 21 out of 23 areas that are evaluated. He also had numerous program tickets, which are in essence like disciplinary violations, but inside, within the SPP program, not necessarily as an inmate would have, but the same sort of thing. But despite his lack of progress in treatment and lack of cooperation and supervision, as evidenced by his program tickets, in the last couple of paragraphs, this report inexplicably recommended that Mr. Grant be conditionally released. So given this internal inconsistency in the report, plus the inconsistency of this Wexford evaluation with prior evaluations, Mr. Grant had been evaluated twice previously for two previous recovery applications, the state simply sought to obtain a second opinion. Just so we're clear here, this first opinion did in fact, the creation of this evaluation did in fact track the statute that requires the director to be prepared and send to the court a sociopsychiatric report provided by an evaluated license under the Sex Offender Evaluation Treatment Provider Act. So the statute was complied here. Oh, yes, absolutely. There's no question about that. It was complied, but the problem was that when the state attorney saw the evaluation, it's this inconsistency internally in the report, as well as the inconsistencies with prior evaluations. As I mentioned earlier, the Wexford evaluators did not have familiarity with the respondents the way the former evaluators did under the old evaluation system, the one of a better term. Ms. Storch? What basis do we have then to go beyond the statute, as Justice Tice said, allowing for the retention or appointment for another expert by the state? Actually, the state's offered the court two bases, Your Honor. First, there's language in subsection 9C, which contemplates the existence of a, quote, state's examiner. And the other basis, Your Honor, would be as an appropriate exercise of the trial judge's discretion under these circumstances to permit the state's attorney to seek a second opinion, given the incongruities in the report and the recommendation, as well as we have to keep in mind the purposes of the act. The act has two purposes. One, ensure that the sexually dangerous person receives treatment so that he can be rehabilitated. But also, the state has an opportunity, or an obligation, I'm sorry, to make sure that the public is protected from a sexually dangerous person until such time as there. And what about the defendant having the same opportunity to have an expert appointed as well? Appointment of expert differs from retention of an expert, Your Honor. The respondent may have, this court has already held, it's well settled from this past. What's the difference? Is it because the state will pay for the retention? Yes. And the appointment, the court pays? No. Which is it? Reverse, reverse. Okay. The state pays for an appointed expert for a respondent. When you say the state, I'm sorry, could you just clarify the question here? When you say the state, who do you mean? Out of what fund? I believe it's the county. The statute provides that the county has to pay for an appointed expert. It's not the state's turn. And so if there's a, whatever verb we're going to use, for the defendant, who pays for that? The county pays for that. So the money's the same either way? I couldn't tell you which one exactly it comes out with. Then what's the difference between retention and appointment? Retention and appointment. A respondent may retain an expert if he has enough funds to retain an expert. And he may retain an expert under the language of the statute. 9C specifically says that if the respondent refuses to talk to or doesn't cooperate with, quote, the state's examiner, then he may present testimony and evidence from an expert retained to conduct a review only of his records and not of the person. But in this case, the respondent did cooperate, and the state would like to have their own expert? But then after that, the state's own expert, couldn't the respondent ask for an appointment then that he wouldn't have to pay for? He could seek an appointment, yes, Your Honor. Under Burns, he may seek an appointment of an expert any time he can meet the Burns standard, where he can show that the IDOC evaluators, the psychologist, the psychiatrist, and the social worker did not give a fair and unbiased opinion of his condition. What about the fact that the Sexually Violent Persons Commitment Act specifically really provides for this, and the Sexually Dangerous Persons Act doesn't? Doesn't that indicate that when the legislature wanted to provide for it, they knew how to do it? It could, Your Honor, but I have to say that before the Sexually Violent Persons Act specifically provided for retention of an expert, the appellate court routinely upheld orders such as this, permitting the state to retain an expert in the absence of any prohibition statute. And that's where we are here, so I would argue, Your Honor, that we're simply in the same position here, temporarily, that the legislature has not yet amended the statute to provide for the retention of an expert. It doesn't prohibit this court from finding either under the statutory language of Section 9c, or perhaps more appropriately, as an exercise of discretion, that this court was well within its discretion to do so. Let's look at the wording of 9c as far as the plain language. 9c mentions the state's examiner. Correct. And isn't it true that the only examiner that has been previously mentioned in this section is the one appointed by the director of the Department of Corrections? No, Your Honor. It's not correct to equate the state's examiner in 9c with the trio of evaluators under 9a. So it isn't reasonable to construe that Section 9c is referring to this examiner when it mentions the state's examiner, since the only examiner mentioned prior was the one appointed by the Department of Corrections? Wouldn't that be a plain reading of that statute? No, Your Honor, for three reasons. First of all, the legislature has used distinct language in distinct subsections. So we have 9a that speaks to the sociopsychiatric evaluation prepared by the Department of Corrections, prepared by the psychiatrist, sociologist, and social worker. But Section 9c is a very different language. It's in a different subsection, and it refers to a state's examiner. The second part is sort of the obvious numerosity distinction. Section 9c refers to a state's examiner in the singular, while the examiners under Section 9a, there are three of them, obviously. And third, the IDOC evaluators that are mentioned in Subsection 9a, they're appointed by the director, and they conduct this evaluation before the state's attorney even becomes involved in this recovery process. So for these reasons alone, it's not appropriate to equate the state's examiner in 9c with this trio of evaluators in 9a. You indicated that the basis of your argument here was the language of 9c, which begins with, if the applicant refuses to speak to, communicate with, or otherwise fails to cooperate with the state examiner. And none of those facts apply here, correct? He did not refuse to cooperate or communicate or speak to? Correct. Our argument is simply that to give effect to every portion of the statute, as this Court has wanted to do, that we have to give some meaning to the phrase state's examiner, and it must contemplate a state's examiner different from the people in 9a. Is there any facts in our record to show that he refused to cooperate with the state's examiner? No. So if that doesn't apply, your alternative argument is generally the Court's discretion outside of the statute? Yes. Right. Given these incongruities, the Wexford report, as I said, logically recommended response to conditional release, finding that he had made no progress in treatment whatsoever since he was committed in 2002. He didn't have any understanding of the defense cycle. He had no relapse prevention plan in place. Dr. Rao, the psychiatrist, had given him a different diagnosis, diagnosed it with fetishism, which differed greatly from the prior diagnosis given to him by prior experts. Is it your position? I'm not sure I understand this clearly. The state, in this case, did move for the appointment of an examiner. You couch your issues in terms of the state should have the right to retain an examiner. Can the state do this outside of the requesting permission from the Court, simply hiring an examiner and bringing that person in as evidence without Court approval? Yes, Your Honor, I would argue yes. But, yes, the state may retain an examiner, but we would need the Court's permission or an order from the Court permitting that doctor to evaluate the respondent. So that's why the state sought permission. So, yes, the state could always retain an examiner to review the records. What the state is seeking here is a more complete picture, a more comprehensive picture of the respondent's mental condition and wants access in an evaluation. Are you going to touch upon your burden of proof argument? I can, if you like, yes. Well, let me ask the specific question, because you argued that you needed an independent examination because you have the burden of proof. And what if the expert, if you were allowed to have an expert, that the Court appointed for you had also concluded that the respondent should be released? Would you then have been entitled, since you still have that burden, and with that expert, that burden is not fulfilled, to the appointment of additional experts until you found one who said that the respondent should remain in custody? I would have to say no, Your Honor, because I think not because it would be prohibited, but I think, A, the dutiful prosecutor, as a matter of prosecutorial discretion, this prosecutor simply wanted to get a better picture. This Wexford report didn't make any sense. He simply wanted a second opinion. If that second opinion confirmed the Wexford report, there's no basis to believe that the prosecutor would have opposed the conditional release. But your same argument would apply? I mean, a burden argument could be made that said, we still have the burden, and then you petition for another expert that would still be allowed? The same argument would apply, but, yes, it gets weaker as it goes on. I have to concede that it gets weaker as it goes down the line. Also, there's definitely a check. In the event that a prosecutor wouldn't exercise this kind of discretion, surely the judge would put a limit on this and exercise discretion and say, no, state, you've had enough. You've had one. That's reasonable. You've had a second opinion. No more. But there could be extenuating circumstances. I do not want to close the door to additional experts, but I think it would be reasonable. We're arguing here that it's reasonable to permit one additional expert for a second opinion. As I was saying, the psychiatrist gave the respondent a qualified mental disorder diagnosis, a fetishism, but his diagnosis differed greatly from previous diagnoses. And the social worker, I'm sorry, the psychologist who did the risk assessment evaluation, he went through and his report states, again, that Mr. Pranted made no progress. He is rated unsatisfactory in the primary goals that are considered crucial in preventing future reoffending, but merely because the respondent scored as a low risk on a single actuarial measure, he recommended conditional release. But as Dr. Stanislaus explained in the trial in this application and in previous reports, the static 99 is but one small part of the guided risk assessment, the actuarial's underestimated risk in general, and the underrated respondent's risk here in particular. And so for these reasons, Dr. Stanislaus defined it as actual risk. It's much greater than that represented by his score in the static 99R. So under these circumstances, the court should hold that the court appropriately exercised its discretion to permit the state to get a second opinion to retain an evaluator, Dr. Stanislaus, who was familiar with the respondent, who had conducted the evaluations, the two prior recovery evaluations, to determine whether the respondent had, in fact, recovered the risk of the actuarial. Sufficiently, the conditional release was appropriate, or even discharge. And finally, I'd like to touch upon the due process argument, because there's really no support for the appellate court's conclusion that if the state has the benefit of an expert, then respondent gets one appointed for him too. It's a civil proceeding, of course, but even in a criminal case, the United States Supreme Court in 8th and Oklahoma said that due process does not require the state to purchase for an indigent defendant all the assistance that a wealthier counterpart may purchase. It's well settled under this court's precedent that Burns, an indigent defendant, I'm sorry, respondent, gets a retained expert when he meets the standards at 4th and that case. Now respondent seems to have conceded that point, and is that belief brief? And studies now appears to be arguing that, well, by virtue of the fact that the state selected Dr. Stanislaus, she was somehow biased against him. But that alone is insufficient to establish bias, and the record shows that the state selected Dr. Stanislaus, her experience, because she previously evaluated him. And more importantly, because in the trial court, respondent expressed a disavow any argument about bias. He said, no, it's just about fundamental fairness. It's not fair that if the state has a bigger budget, she gets an expert and we don't. And he cannot now in this appeal raise this argument for the first time, whether it's an orphiture, a waiver, an estoppel. It's inappropriate in this appeal for the first time. Thank you. Thank you, Ms. Drummond. Thank you. Good morning. Good morning. Pleased to court. My name is Cord Wittig. I'm from the law firm Kruger, Henry & Hunter in Tropas, Illinois. I was appointed to represent Mr. Grant in the trial court. I was also representing him in the 5th District above court, and now I'm representing him here. All the issues that the state's raised in its initial brief, I think adequately addressed in our response brief. So I'm just going to, unless there's any questions on my response, I'm going to limit my comments to their reply brief. The state reiterates in its brief that the act allows them to retain an expert. I just want to point out that in the state's motion in the trial court, they sought the appointment of an expert. The order that was entered in the trial court appointed an expert. The order appointed Dr. Stanislaus, and Mr. Grant was ordered to comply and submit to the examination. The state acknowledges in its reply brief that the act does not explicitly state that the state and their respondent may retain an expert. Then they get into this argument about the state's examiner that I know Ms. Dorsch was asked about. It's our position that the phrase the state's examiner applies to the aforementioned team of experts chosen by the director of the Department of Corrections. As Your Honor pointed out, I believe it's a reasonable interpretation in the plain language of the statute to conclude that the state's examiner means those experts. Had it meant something else, the legislature very easily could have inserted language in there just as it did in the Sexually Violent Persons Act. The Sexually Dangerous Persons Act was amended subsequent to the sexually... The language that was in the Sexually Violent Persons Act was in there, allowing the state to retain an expert. The Sexually Dangerous Persons Act, Section 9, was amended after that language existed, and it did not insert that language in there. I think that we can reasonably conclude it's because the legislature did not intend for that procedure to apply in this instance. If in this case the state is limited to the report, the reports that were tendered, the three reports, and they're not allowed to retain an expert or have one appointed, how would they... What could they do about the fact, assuming that what she says is true about it's inconsistent, he wasn't complying and so forth and so on, but they said release him, how do they go about maintaining their burden of proof or showing he still should be in the institution? I think it's the same way. Are they stuck with it? I mean, they're just stuck with it? I think so. I think they have the same tools that indigent defendants have had throughout the history of this act, which would be research, discovery, and cross-examination under oath. They can point out whatever inconsistencies they believe exist to the jury, and that might whittle away at the report. But there is something that I would like to address. The state keeps going on about these deficiencies in the report. The report was not deficient. The act requires that a mental disorder exist that predisposes a person to commit sexual offenses. For this evaluation, the 2012 Wexford evaluation, they found that at this time Mr. Grant did not have a mental disorder that predisposed him to commit sexual offenses. And that diagnosis, the Access 1 diagnosis, that they found him to have was fetishism, women's undergarments, and personality change due to condition, either a closed head injury or some other developmental problem. Now, it's not inconsistent. It's been consistent throughout this whole case that the Access 1 diagnosis has changed. In 1992, Dr. Warschauer diagnosed him with pedophilia opposite sex, exclusive type 302.20, which I assume was a DSM code. In 1999, Dr. Widger diagnosed him Access 1, adjustment disorder with depressed mood and borderline intellectual function. In 1999, Dr. Warschauer reexamined him, didn't find an Access 1 diagnosis. In 2002, the doctor that we refer to in the trial court as Dr. Van diagnosed him with adjustment disorder with depressed mood. In 2002, Dr. Parwatikar diagnosed him Access 1, paraphilia, not otherwise specified, with features of pedophilia, fetishism, and satanism. In 2005, Dr. Stanislaus, when she was employed with Wexford doing SDP evaluations at Big Money, diagnosed him just with paraphilia, not otherwise specified. In 2010, Dr. Stanislaus re-evaluated him, same evidence, diagnosed him transvestic fetishism, paraphilia, not otherwise specified, real life pedophilia. So she changed her diagnosis in five years with the exact same evidence. In 2012, Wexford made their diagnosis, and then in 2013, Dr. Stanislaus re-diagnosed him with the same diagnosis in 2010. So to say there's deficiencies based upon that, that's not correct, because throughout, for the past 25 years, his diagnosis has been dynamic. So they found that he did not have the requisite mental disorder. And because he didn't have the mental disorder, the lack of progress in treatment was irrelevant. It doesn't matter because he didn't have the underlying mental disorder that predisposed him to commit sexual offenses. And they didn't say, well, we're just going to discharge him outright. They said, he's been in an institutional setting, we recommend that he be committed to conditional release, and we evaluate him under some kind of stringent guidelines. So I don't think that there was a deficiency or inconsistencies. It was just that his lack of progress in treatment is kind of irrelevant because we don't think he has the mental disorder. You've indicated that the experts apparently have had many different diagnoses, view of his condition, et cetera. The appellate court looked at the statute and said that it contemplated, the statute contemplated reliance on impartial experts rather than a battle of experts retained by the parties. And that's kind of a broader statement than trying to understand what the statute works. Do you agree with that? Do you think that's what the statute is about? I do agree with that. And the state has agreed with that numerous times before. They've used the argument that evaluators chosen by DOC are impartial, not biased, and that's why a respondent shouldn't be allowed to have an expert appointed for him unless he can prove biased. Now, if a respondent comes along that has the funds, perhaps they can retain an expert. In my experience, the respondents in this situation are never, I don't say never because I guess it's a possibility, but it's highly unlikely that they'll ever have the funds. And I believe that because this is a statutory cause of action. There was no common law for it. It should be strictly construed. It should be strictly construed in favor of the person who is going to be subject to its restrictions, and that's Mr. Grant. It should be applied in favor of him. And when you do that, the procedure that was initially followed, the appointment of the experts by DOC, director of the evaluation, and that's where it should have stopped at that point in time. How do you address Ms. Dorsch's position that the evaluators, plural, with respect to DOC and the states examiner singular? Do you remember that argument that she made? In Section 9C? Right. Yeah, 9C is singular. It's talking about the states examiner where she said that there's reference to the evaluators being plural so that 9C is not talking about the evaluators of IDOC, but rather an independent examiner. Well, I think if they wanted states examiner to mean an independent examiner, they could have put it in there. Why insert vague language like that, especially when they had put express language in the SBP Act just a few years before? So it's strictly construed in favor of Mr. Grant, and I think you have to read that to mean the evaluators appointed by DOC. And I think there's a varying of roles between the psychologist, the psychiatrist, and the social worker. The social worker doesn't – they get the social history of the person.  The one of the – whether it's psychiatrist or psychologist, one makes the axis one diagnosis, one administers the static 99. So I think you could also interpret that to mean one of the doctors, either the PhD or the MD, would be labeled the states examiner. And I think also it's important to note that Section 9 has been amended to where it's no longer a team of three. It's just a single evaluator. And then the states examiner language has stayed the same. And I want to clarify. I don't think that the appellate court was saying if the state gets an independent expert, then the respondent should get an independent expert. I think what it's saying is that this should not have ever happened at all. But by not giving the respondent an independent expert, it compounded the error. So it's not saying we want five experts in here. It's just saying this shouldn't have been done. But by giving it to the state, they've exacerbated the situation. In my brief, I've raised the Fifth Amendment argument. The state, in its reply, has cited the case of People v. Allen, the Illinois Supreme Court case. That was in 1985. And it unequivocally says that the sexually dangerous person is perceived as civil and not criminal. The defendant is not entitled to refuse to answer psychiatrist questions which might incriminate him. They must answer all questions in such examinations regardless of the possible incriminatory nature of answers. That was affirmed by the United States Supreme Court. However, since then, in 2001, this court, in the case People v. Traynor, specifically stated the recovery petition is of such a nature that due process entitles the defendant to the right against self-incrimination. In 2004, in People v. Lawton, this court once again, that was a Section 4 procedure, the initial petition. This court stated that a defendant subject to the Sexually Dangerous Persons Act must be accorded the same essential rights available to defendants in criminal cases, including the right against self-incrimination. And then in 2005, the legislature amended Section 9 by adding subparagraph C, and that's when they inserted the language, if the applicant refuses to speak to, communicate with, otherwise fails to cooperate. So it seems to me like there's been a fundamental shift away from the bright-line rule that the Fifth Amendment doesn't apply to this proceeding to where, over the past 30 years, this court's acknowledged that the privilege against self-incrimination should apply, and the legislature has, by amending Section 9, they've kind of implied, too, that they acknowledge some privilege against self-incrimination applies. And it's important because the Fifth District had previously held that a defendant could not be called as an adverse witness in a sexually dangerous person's case. So what's happened in this case is Dr. Stanislaus interviewed the respondent, got all kinds of information, obtained his statements, statements to her about the underlying case, about his progress in treatment, and then when she testified, she testified to the statements, and then she explained to the jury why he was either lying or not being fully truthful, or just didn't make any plain sense. So now the jury's hearing, you know, not just that he remains to be a sexually dangerous person, but that he's not truthful either. So they've bootstrapped his testimony to Dr. Stanislaus, effectively calling him as an adverse witness against himself. That's about all I have to say. If there's any other questions, I'll yield the floor to Ms. Doerscher. It doesn't appear there are any other questions, counsel. Thank you. I just have a few points. First of all, the argument about trying to distinguish appointment from retention which is really elevating form over substance. As I explained, I believe it was just a form-wise question, although I'm not certain it was. What the state sought was to get a second opinion. All the state was looking for was a second opinion. We're not challenging the outcome of the proceedings. We're just saying, based on this, it didn't make much sense. We've got working patients, and he hasn't made any progress. He's no different, treatment-wise, than he would have been. And yes, it looks like his diagnosis is different, but we want a second opinion to see, because previous evaluators had given him diagnoses such as paraphernalia, NLS, and pedophilia that would be diagnoses, mental disorders, and predisposed women that would be diagnosed as such. What we wanted was to have this expert, Dr. Stanislaus, who was familiar with the respondent having a previous evaluation, get a second opinion. What we needed was an order from the judge giving this evaluator, Dr. Stanislaus, access to the respondent so she could evaluate him and get a comprehensive picture of where he was at, to see whether he was, in fact, prepared or ready for initial interviews, despite his lack of progress in treatment. Paragraph 9C provides that an applicant who refuses to speak with or fails to cooperate can only introduce an expert or professional based upon a review of the records. Could your expert have done that without having him or her examine the respondent here? Yes. Yes, it's definitely our – we have to concede that the state could retain an expert out of state funds to examine the record and present a testimony. But, of course, what we were looking for was a more comprehensive picture of this respondent. And, really, I think we would all agree that it's better, the evaluation is better if you actually get to speak with the respondent. And that, I think, is why 9C is in there. It's in there. It says, okay, respondent, you retain an expert. You're not going to get an advantage over the state by refusing to cooperate with the state's examiner but talking to yours so that somehow your opinion, your doctor's opinion, looks better and more comprehensive in front of the jury. So that's in there too. It reflects a value judgment on the quality of the evaluation, whether it's based on records or based on evaluation. To respond to this point about amendment of the SBP Act, I don't think it's appropriate to compare amendments of the SBP Act and say, well, they could have amended the SDP Act at any time. There are distinct acts. The SBP Act is a relatively recent creature from 1998. The SDP Act is from 1938. Sometimes they're similar, but they are, in many respects, very different. And I don't think there's any reflection of legislative intent that they amended the SBP Act to provide for retention of an expert but didn't do the same in the SDP Act. I don't know that they were ever amended in tandem in such a fashion. I don't think it reflects legislative intent here. The appellate court remanded, right? The appellate court remanded, yes, because respondent had additional issues. So what we were asking this court to do, reverse and remand for further consideration of his remaining appellate issues, yes. Okay. So there's a remand, as it is stated right now, there's a remand to the trial court. I know you didn't prevail in that. If we agreed with the appellate court, would you presumably be allowed to use the procedure that was just articulated by Justice Carminer? Yes, Your Honor. We would argue that we would be permitted to use that procedure and certainly retain an expert to review Mr. Grant's record to bear in these gaps. And one more thing to the burden of proof argument, Your Honor, that by putting the burden of proof on the state, the statute and the legislature must contemplate that the state can rely on evidence outside of the report prepared by the IDFC evaluators, otherwise it would just effectively be self-executing. If this respondent wants or seems to want to foretold that the outcome is determined solely by that initial evaluation by the three evaluators in 9A, there would be no need for burden of proof. It's simply not self-executing in that form as a trial. But the state, of course, has to present expert testimony to sustain its burden. For that reason as well, the act contemplates that the state must be able to, in certain circumstances, very least in certain circumstances, retain an expert to meet its burden. And again, I can't stress enough what we're looking for here is just an opportunity to get another opinion, a second opinion on this respondent's condition, so we know whether release is appropriate for him or not. Is there any issue of the applicant refusing to speak, communicate with, or fail to cooperate with the state's examiner if, indeed, this court looks at the state's examiner as the IDOC evaluators? If I read that, the problem with that, then it wouldn't really have any teeth, because if the respondent doesn't retain an examiner but refuses to talk to the IDFC evaluators, there's no negative consequence. He's somehow come out from under that provision. I don't know if I'm explaining myself very well. What I'm suggesting is that, as I said earlier, we're trying to make sure that he doesn't cooperate with his expert and not cooperate with the state's expert. That provision really wouldn't have any effect if he didn't speak to the IDFC experts, because he wouldn't have a corresponding expert of his own under his version of the statute. If there are no further questions, we'd ask this court to reverse the appellate court judgment. Thank you. Case No. 11916, two people of the state of Illinois v. James E. Grant, will be taken under advisement as Agenda No. 5. Ms. Doersche and Mr. Wittig, thank you for your arguments this morning. You're excused at this time.